IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OVERSEAS PARTNERS RE LTD., <br><br> Plaintiff, <br><br> vs. <br><br> ACE AMERICAN INSURANCE COMPANY, ACE PROPERTY AND CASUALTY INSURANCE COMPANY, ACE INA GROUP OF COMPANIES and STATE STREET BANK & TRUST COMPANY <br><br> Defendants. | ) <br> ) <br> ) <br> ) C.A. No. 04-11936 RCL <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, Overseas Partners Re Ltd. ("OP Re"), submits this Memorandum of Law in support of its motion for a Temporary Restraining Order and Preliminary Injunction enjoining the defendants ACE American Insurance Company, ACE Property & Casualty Insurance Company, and ACE INA Group of Companies (collectively, "ACE") from drawing down a letter of credit established in its favor by OP Re and issued by defendant State Street Bank & Trust Company ("State Street"), and enjoining State Street from honoring an call or demand for payment. In further support of this motion, OP Re relies on the Verified Complaint for Injunction in Aid of Arbitration and the Affidavit of Philip D. Birkby, which are submitted herewith.

1

I. **Factual Background**

A. <u>**OP Re's Treaty Of Reinsurance With ACE.**</u>

OP Re and ACE are parties to a reinsurance agreement known as the Space Quota Share Treaty (the "Treaty"), bearing contract no. BG 930900, effective April 1, 2000 until terminated. The Treaty reinsured ACE policies allocated to its Space Account, involving risks related to satellites. (Ex. 1.) The Treaty contains an arbitration clause covering all aspects of the parties' dealings. Arbitration is a prerequisite to any action designed to exercise the parties' rights where they are in dispute. The provision reads, in pertinent part, as follows:

> As a condition precedent to any right of action hereunder, any dispute arising out of the interpretation, performance or breach of this Contract, including formation or validity thereof, shall be submitted for decision to a panel of three arbitrators. Notice requesting arbitration will be in writing and sent certified mail, return receipt requested.

Article XXIX. (Ex. 1.)

B. <u>**The Treaty Endorsement.**</u>

By an endorsement to the Treaty, effective September 30, 2002, OP Re and ACE agreed to a commutation of a portion of the obligations and liabilities under the Treaty (the "Endorsement"). The remaining obligations (the "retained risks") were listed in a Schedule A to the Endorsement. (Ex. 2.) According to a Schedule B to the Endorsement, OP Re was required to post collateral of up to $19,615,606.00 in respect to the retained risks, and provided for the collateral to be in the form of a letter of credit or trust fund. (Ex. 2.)

Schedule B to the Endorsement provides in pertinent part that:

> *The Reinsurer [OP Re] and Reinsured [ACE] agree that the Letter of Credit ... may only be drawn upon if [OP Re] fails to pay a loss within 60 days of receiving notice of a paid loss in respect to the Secured Risks by [ACE] pursuant to the [Treaty] (the "Loss Notice").* Such notice shall include a copy of the loss occurrence notice sent by the relevant Name Insured, if available, and confirmation of payment of said loss by [ACE]. In the event of a draw down,

[ACE] may only draw an amount equal to the loss payment due from [OP Re] pursuant to this paragraph.

(Ex. 2.) (emphasis added).

Schedule B also provides that:

> *At quarterly intervals, [ACE] shall prepare a specific statement of the total OPRE Satellite Limit for the Secured Risks outstanding (the "Outstanding Limit") for the purpose of amending the Letter of Credit* . . . in the following manner:
>
> (a)   If the statement shows that fifty percent (50%) of the Outstanding Limit exceeds US$19,615,606, [OP Re] shall within thirty (30) days after receipt of notice of such excess, secure delivery to [ACE] of an amendment to the Letter of Credit . . . increasing the amount of credit to US$19,615,606.
>
> (b)   If, however, the statement shows that fifty percent (50%) of the Outstanding Limit is less than the balance of credit as of the statement date, *[ACE] shall, within thirty (30) days, release such excess credit by agreeing to secure an amendment to the Letter of Credit . . . reducing the amount of credit available by the amount of such excess credit.*

(Ex. 2.) (emphasis added).

### C.   The Letter of Credit.

Pursuant to its obligations under the Endorsement, OP Re caused State Street to establish an Irrevocable Letter of Credit, No. ILC-1198/BSN, in favor of ACE for an amount up to $19,615,695.00 (the "Letter of Credit"). (Ex. 3.) The Letter of Credit provides for automatic renewal for a one year period upon October 31 of each year, unless notice of termination or non-renewal is given at least sixty (60) days prior to such date. (Ex. 3.)

Despite its obligations under the Endorsement to make quarterly statements of the Outstanding Limit on the secured risks, ACE has never made such a statement. Consequently, there has been no compliance by ACE with its obligation to effect reductions of the Letter of Credit should the balance of credit exceed 50% of the Outstanding Limit.

**D.     Dispute Regarding Letter of Credit.**

On or about June 21, 2004, OP Re informed ACE that, not having received statements from ACE, OP Re had prepared its own statement of the Outstanding Limit. The spreadsheet prepared by OP Re indicated that the Outstanding Limit was $28,256,731. According to the Endorsement, the value of the Letter of Credit should not exceed 50% of the Outstanding Limit. As a result, OP Re determined that the Letter of Credit was over-funded, and should be reduced from $19,615.695 to $14,128,365. (Ex. 4.) On or about July 26, 2004, OP Re sent a follow up communication to ACE requesting ACE's response to the statement of the Outstanding Limit prepared by OP Re and forwarded to ACE on June 21, 2004. (Ex. 5.)

On or about August 24, 2004, ACE requested that OP Re forward bank wire instructions. ACE made no reference to the statement of Outstanding Limit or ACE's obligations according to the Endorsement. (Ex. 6.) OP Re complied with ACE's request by forwarding wire transfer instructions and requested details on why ACE required these instructions. (Ex. 7.)

Shortly thereafter, ACE sent an ACE-created spreadsheet to OP Re, without explanation, suggesting that the Letter of Credit balance should be $15,710,004, an amount which exceeded OP Re's calculations. (Ex. 8.) Based on the ACE spreadsheet, however, it was clear that the appropriate Letter of Credit balance was even less than OP Re's previous calculation. In particular, the schedule showed that, based on ACE's own numbers, the Letter of Credit balance should be $12,529,677, as opposed to OP Re's original figure of $14,128,365. (Ex. 9.)

At or around this time, OP Re had been in the process of restructuring its entire collateral facilities. As part of this effort, it gave notice to ACE on or about August 25, 2004, that the Letter of Credit would be cancelled effective October 31, 2004 and a replacement letter of credit, or other form of collateral, be established. (Exs. 10, 11.) On or about August 26, 2004,

notwithstanding the fact that ACE had never provided OP Re with a notice of paid loss as required in Schedule B to the Endorsement, ACE advised that it now intended to draw down the entire amount of the Letter of Credit and refund the "balance" of $3,905,602 to OP Re. (Ex. 12.)

OP Re objected to ACE drawing on the Letter of Credit for an amount in excess of OP RE's share of settled and paid claims. (Ex. 11.) Based on ACE's revised spreadsheet, the amount of settled and paid claims equals only $9,349,351. The difference in figures arises from mathematical errors on ACE's spreadsheet involving the two "Anik F1" claims, which apparently have been only partially settled and paid by ACE, and the "Thuraya 1" claim, which has not yet been settled and paid. In particular, ACE took credit for having settled the Anik F1 claims at 67% of the sum insured when in fact documentation available to OP Re shows a settlement at only 49% of the sum insured. With regard to the Thuraya 1 claim, as it remains unsettled by ACE, ACE is not entitled to include it in the amount of its draw down.

The numbers in ACE's revised spreadsheet also indicate that the balance of the Letter of Credit needs to be reduced. ACE's settlement of the Anik F1 claims provides that it will pay an additional amount (up to 17.67% of the sum insured) to be determined in 2007. The 2007 portion of the claim settlement could equal a maximum of $1,101,739. In addition, ACE's maximum exposure for the Thuraya 1 claim is $5,238,338. Thus, the Outstanding Limit equals $6,340,077 (assuming settlement of the paid claims of $9,349,351). According to the Endorsement the balance of the Letter of Credit should not exceed 50% of Outstanding Limit, which amounts to $3,170,039. Consequently, ACE is only entitled to a draw down on the Letter of Credit in the amount of $9,349,351 (assuming proof of paid claims in that amount) and is contractually required to obtain a reduction of the Letter of Credit to $3,170,039.

On or about September 2, 2004, ACE improperly submitted a sight draft to State Street to

draw $15,710,004.00 from the Letter of Credit. State Street has indicated that it intends to honor the sight draft at the "end of the day" on Tuesday, September 7, 2004, following the Labor Day holiday. On or about September 3, 2004, OP Re demanded arbitration against ACE in this matter. (Ex. 13.)

## II. OP Re is Entitled to a Temporary Restraining Order and a Preliminary Injunction.

### A. Standard of Injunctive Relief.

The First Circuit requires the party seeking injunctive relief to demonstrate the following: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by granting the injunction. *See e.g., Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51-52 (1st Cir. 1986). OP Re satisfies each of these requirements.

### B. The Court Should Exercise Its Discretion to Grant Injunctive Relief to Preserve the Status Quo in Order for the Arbitration Panel to Meaningfully Exercise Its Exclusive Jurisdiction and Give Full Effect to the Parties' Arbitration Agreement.

The First Circuit has recognized that a district court has discretion to grant injunctive relief in an arbitrable dispute pending arbitration. *See Teradyne*, 797 F.2d at 51. It also has recognized that "the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration." *Id.* Accordingly, the court should grant injunctive relief to preserve the status quo pending the arbitration panel's decision where the conduct to be enjoined would render the arbitration process a "hollow formality." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054-55 (4th Cir. 1985) (court found that granting an injunction to prevent a party to an

6

arbitration from irreversibly altering the status quo would further the congressional policies underlying the Federal Arbitration Act). The court need not consider the arbitrability of a dispute before exercising its discretion to grant injunctive relief to maintain the status quo. *See Teradyne*, 797 F.2d at 51.

### C. OP Re Will Suffer Irreparable Harm Should ACE be Allowed to Infringe Upon the Power of the Arbitration Panel to Resolve the Dispute Concerning the Letter of Credit.

Under the Treaty, ACE is unquestionably required to submit to arbitration any dispute regarding administration or claims under the Treaty before exercising any disputed right under the treaty. Arbitration is a "condition precedent to any right of action," including any self help in the form of drawing down on the Letter of Credit in whatever amount it chooses. In this matter, the dispute involves the Letter of Credit itself, as well as the parties' obligations with regard to it. Rather than comply with its obligations under the Treaty and maintain the status quo while the issue is resolved through arbitration, ACE is now seeking improperly to draw down on the Letter of Credit, in effect destroying the very thing at issue. By doing so, ACE is ignoring its obligations under the Treaty and the Endorsement. ACE's conduct is designed to alter irretrievably the status quo and thus infringe upon the exclusive jurisdiction of the arbitration panel to address the parties' rights and obligations with regard to the Letter of Credit.. An injunction is necessary to prevent ACE from depriving the arbitration process of any validity, and courts have recognized that great deference shall be given to an arbitration panel's jurisdiction as contractually expressed by the parties in this clause. *See, e.g., Green Tea Fin. Corp. v. Conseco Fin. Corp.*, 539 U.S. 444, 123 S. Ct. 2402, 2407 (2003).

### D. The Balance of Hardships and Public Interest Favors Injunctive Relief to Uphold the Powers of the Arbitration Panel to Render a Meaningful Decision

There is minimal or no risk of harm to ACE if it is prevented from destroying the subject

7

matter of the arbitration. ACE agreed in the Treaty to submit disputes to arbitration, and cannot claim injury from being required to comply with its agreement. Moreover, if the arbitration panel determines that ACE's claims are bona fide, it will still be able either directly from OP Re or pursuant to a draw on the Letter of Credit to obtain what is owed. If, however, the arbitration panel finds in favor of OP Re, there would, of course, be no draw down on the Letter of Credit in excess of what ACE may be entitled to, and ACE would be required to obtain a reduction of the Letter of Credit as provided in the Endorsement.

The public interest favors arbitration in disputes where the parties have agreed upon arbitration as a remedy. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24-25 (1983). This public interest and the congressional intent underlying the Federal Arbitration Act militate in favor of the court granting injunctive relief to preserve the status quo pending arbitration so that the arbitration proceeding is not rendered a "hollow formality." *See, e.g., Teradyne*, 797 F.2d at 51; *Bradley*, 756 F.2d at 1054-55.

### E.     Likelihood of Success.

OP Re's motion seeks only to maintain the status quo pending the conclusion of the arbitration. Although the court is not required to consider the arbitrability of the dispute in order to grant injunctive relief under these circumstance, the facts show that the Treaty contains an arbitration clause covering all aspects of the parties' dealings. Accordingly, the merits of the dispute will be considered by the arbitration panel, whose proceedings will be rendered a "hollow formality" should ACE be allowed to alter the status quo by drawing down the Letter of Credit. *Bradley*, 756 F.2d at 1054-55. Moreover, the facts clearly demonstrate that OP Re is likely to succeed in this dispute, in part because its claims are based on calculations using ACE's own numbers.

### III. CONCLUSION

Accordingly, for the reasons stated herein, in the Verified Complaint, and in the Affidavit of Philip D. Birkby, OP Re requests that a temporary restraining order and a preliminary injunction order be entered in accordance with the Motion for a Temporary Restraining Order and Preliminary Injunction.

Respectfully Submitted,

Rhonda L. Rittenberg, BBO#550498
John E. Matosky, BBO# 641661
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, MA 02109
(617) 456-8000

Dated: 9/3/04